

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-26-00022-CV

———————————————

IN THE INTEREST OF D.J., A CHILD

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-755184-24

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant J.J. (Father) and Appellant L.R. (Mother) appeal the termination of their parental rights to their daughter D.J. (Destiny)[2] following a two-day bench trial.[3] The trial court terminated Father's and Mother's parental rights based on clear and convincing evidence of the endangerment predicate grounds and the best-interest ground; the trial court also terminated Mother's parental rights based on the predicate ground that she had previously had her parental rights terminated as to another child based on an endangerment ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M), (b)(2). Father's court-appointed attorney filed an *Anders*[4] brief, stating that she was unable to identify any legally nonfrivolous ground constituting error. In four points, Mother argues that there is insufficient evidence to support the endangerment and best-interest findings and that the trial court's letter ruling omitting the predicate finding under Subsection (M) should control over the termination order. Because Father's

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of an appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after the notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

[3]The trial dates were December 3, 2025, and December 10, 2025.

[4]*Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967).

appeal is frivolous, we affirm the trial court's judgment terminating his parental rights to Destiny. Because Mother's sufficiency challenges fail, as does her letter-ruling argument, we affirm the trial court's judgment terminating her parental rights to Destiny.

## II. Background

This court is familiar with Mother from a prior appeal involving five of her children at a time when she had eight children. *See In re J.D.*, No. 02-24-00404-CV, 2025 WL 52128, at *1, *3 (Tex. App.—Fort Worth Jan. 9, 2025, no pet.) (mem. op.). While that case was pending, Mother gave birth to Destiny, who is the only child at issue in this appeal. *See id.* at *1. And while this case was pending, Mother gave birth to L.J. (Libby). Mother's ten children do not all share the same father, but Father is the father of Destiny and Libby. *See id.* at *1 n.5.

During the two-day bench trial, the trial court heard testimony from the permanency specialists who handled the case and from Mother and received an oral report from the children's ad litem. Much of the focus of their testimony was on Mother's drug use and her failure to take requested drug tests. Because Mother challenges the sufficiency of the evidence, we set forth a detailed summary of the testimony and include details about Father only when necessary to assist with the sufficiency analyses.

### A. Initial Permanency Specialist's Testimony

Amanda Rountree, a permanency specialist with Our Community Our Kids (OCOK),[5] testified that she was the initial permanency specialist on Destiny's case from August 2024 until April 2025. Rountree testified that in August 2024, a termination trial was held regarding five of Mother's other children. The Department admitted the termination order from that trial. The termination order showed that the trial court had terminated Mother's parental rights to three of those children based on the endangerment predicate grounds.

Rountree testified that while that trial was occurring, the Department removed Destiny for neglectful supervision by Father and Mother. At the time, Destiny was living with Father and her Paternal Grandmother; Mother had no idea where Destiny was and had not known her whereabouts for two months. Mother did not have housing at the time of the removal and was not a candidate for Destiny's placement because she "had a . . . long-standing open case with [Rountree] with her other children. [Mother] never worked any of the services on her service plan or demonstrated any stability . . . . [And] there were concerns from the previous case that hadn't even been addressed going into [Destiny's] case." Specifically, Mother "had only had a job very temporarily," and so her income was a concern, along with a

---

[5]Rountree agreed that (1) OCOK is the Tarrant County contractor that provides case-management services for the Texas Department of Family and Protective Services (the Department) when a child is removed from his or her parents, and (2) OCOK acts as the Department's agent in cases involving the removal of children.

lack of housing, her failure to engage in therapeutic services, and her failure to submit to drug testing.

After the removal, the Department allowed Destiny to continue to live with Paternal Grandmother and instructed Father that he could not live with them. But when Destiny's August 14, 2024 hair sample tested positive for, among other things, methamphetamine, cocaine and four of its metabolites, hydrocodone, norhydrocodone, and various cannabinoids and Paternal Grandmother refused to take a drug test, the Department removed Destiny and placed her in a foster home that was set up as a general residential operation (GRO).[6]

At the end of August 2024, Rountree had a discussion with Mother about inpatient drug treatment. Mother said that she was waiting for an open bed at Nexus Substance Abuse Treatment Center and that she felt like she needed to work on herself. During the time that Rountree handled this case, Mother did not enter inpatient drug treatment.

Also at the end of August 2024, Rountree spoke with Father. Father said that he had taken Destiny from Mother because he was the better parent and because he did not want her "being homeless and moving from house to house with random men." Yet, when Rountree observed Father's visit with Destiny at the end of August

---

[6]Rountree explained that a GRO resembles a residential neighborhood with multiple homes set up on a large plot of land and with each home having individual caregivers for the children assigned to that home. The same caregivers served as Destiny's foster parents throughout the case.

2024, he seemed unfamiliar with how to care for her and asked the staff to change diapers and prepare bottles.

Father admitted that he was selling drugs and that he was using marijuana to cope with his emotions. Father stated that he regretted having been honest with the investigator about using and selling drugs because it had resulted in Destiny's removal.

Rountree described an incident that occurred at the Department's office on February 5, 2025, after Mother and Father had visited the children. Rountree heard Father call Mother a b---h, heard her tell him not to call her that, and saw him closely walking behind her as they were waiting for their transportation. When Mother came back in the building, Father remained outside, and Rountree asked if she was okay and if she wanted separate transportation so that she did not have to ride in the same Uber as Father; Mother said that she was fine and refused separate transportation. When Rountree was alone with Mother, she said that she was plotting her "great escape" from Father, but she still left in the same car with him.

Father and Mother arrived separately to the following week's visit on February 12, and he said that they were no longer residing together.

At the February 26, 2025 visit, Mother said that she had given birth to Libby and that she and Libby were residing with Maternal Grandmother under a safety plan. Rountree testified that the Department was not appointed Libby's temporary managing conservator. When Rountree checked on Libby, she appeared "healthy and fine."

6

On March 4, 2025, Mother requested that her visits with Destiny be separate from Father's[7] and said that she and Libby would be moving to the domestic-violence shelter SafeHaven.[8] By the time that Rountree left the case, Mother had moved to SafeHaven and had taken her fifteen-year-old daughter T.D. (Tiffany) and Libby with her. Rountree agreed that Mother's seeking services through SafeHaven was an appropriate step given her situation and was considered a positive change intended to address the Department's concerns.

During the time that Rountree had the case, Mother was offered twenty-two visits with Destiny and had attended twelve. Rountree testified that Mother's absences were due to "a lot of time periods where [she] could not be located," as well as her not having a working cell phone and relying on Ubers. Rountree opined that Mother's giving birth to Libby briefly impacted her ability to visit with Destiny.

### B. Mother's March 2025 Drug-Test Results

Mother's March 7, 2025 hair-follicle test was positive for cocaine and two cocaine metabolites, marijuana and marijuana metabolite, opiates, and oxycodone with oxycodone confirmed.

---

[7]Mother had previously declined Rountree's offer of separate visits.

[8]Although Rountree noted that SafeHaven has been renamed Archway, other witnesses continued to call it SafeHaven. For consistency, we will use SafeHaven when referring to the shelter where Mother initially resided and later obtained housing assistance.

## C.  Subsequent Permanency Specialist's Testimony

Denisha Thornton, who served as the permanency specialist after Rountree, testified at the December 10 trial setting and gave an update on Destiny. Thornton described Destiny as a "very smart," very happy, energetic one-year-old toddler who was learning to say one-syllable words, was very attached, and was very clingy. According to Thornton, Destiny followed her parents—both her foster parents and Mother—everywhere they went. With regard to Destiny's bond to Mother, Thornton clarified that although Destiny was clingy around Mother, Thornton did not see consistency because of Mother's missed visits.

Thornton described Destiny's foster parents as "very hands on." Thornton explained that they had kept her informed about everything that had gone on with Destiny and had made sure that she was ready to go to her parent–child visits and her Early Childhood Intervention (ECI) appointments. Thornton said that Destiny's foster parents also had made sure that she was properly clothed and fed and had provided a safe and stable living environment for her.

In mid-June 2025, the Department requested the trial court to extend the dismissal deadline so that Mother could obtain housing and employment and finish her services. Mother obtained housing assistance and moved to an apartment.

At the end of June when Thornton visited Mother's home, she had Libby with her, as well as her daughters Lizzy (age seventeen), Tiffany (age sixteen), and J.D.

8

(Jennifer) (age fifteen).[9]  At that home visit, Thornton noted beds for the children, food in the refrigerator, running water, and no safety concerns with doors or electricity.

But the Department had other safety concerns regarding the home.  Thornton said that she visited the home weekly due to concerns over Jennifer's behavior; Thornton needed to see Jennifer and the other children due to safety and "medical reasons."  Thornton also said that the Department had "concerns" about whether Jennifer presented a safety threat to Mother and the other children in the home.[10] Thornton agreed that the Department had safety concerns regarding Libby because Mother often left her teenagers to care for Libby and because physical abuse had previously occurred when Mother had left her teenagers to babysit her other children. But Thornton admitted that the only CPS investigation that had occurred during the eight months that she handled the case was not due to the teenagers in the home but due to the birth of Libby.

---

[9]Rountree testified that Tiffany was never in the Department's care and that Jennifer was returned to Mother but was still under the Department's permanent managing conservatorship.

[10]Thornton agreed that Jennifer has "significant needs, appointments[,] and such" and that she had missed medical appointments while in Mother's care.  Due to Jennifer's behavior, she had been in over thirty placements in less than two years prior to being placed with Mother and was enrolled in alternative school but had not been attending.  Mother told Thornton that Jennifer had assaulted her when they were residing at SafeHaven.  And Mother testified that Jennifer was involved in juvenile court after being involved in a fight, that she was on pretrial release, and that she was required to attend juvenile alternative school.

Another safety concern was due to Father. Because Mother had expressed feeling unsafe around him, the Department had put a safety plan in place to protect the children. The safety plan required that Father not be allowed in the home while the children (Libby, Destiny, Tiffany, and Jennifer) were in the home. Thornton opined that Mother had abided by the safety plan and believed that showed Mother's protective capabilities.

Thornton testified about Mother's missed visits. For one missed visit, Mother said that she did not have her phone charged to request an Uber. Because of Mother's inability to attend her visits with Destiny, the Department initially offered Mother the opportunity to have the visits moved to her home if she could make it on time to three consecutive visits, but she did not meet that challenge. Despite Mother's failure, Thornton successfully petitioned her superiors to have Mother's visits moved to her home in October 2025. Even with that accommodation, Mother missed some visits in October and November 2025. In total, Mother was offered thirty-two visits during the time that Thornton handled the case, but Mother attended only eleven.[11]

---

[11]Of the thirty-two visits, Mother canceled one because she went to the emergency room the night before and another because she did not want Destiny to travel the one and half hours in the rain, though Destiny had already been transported to Fort Worth. Father and Mother were offered a visit between the two trial dates, but they canceled an hour beforehand (despite that Destiny had already been transported to Fort Worth) and did not ask to make up the visit.

Thornton also testified about Mother's missed drug tests. Thornton told Mother in July 2025 that she had a drug screening scheduled and that an Uber was set up, but Mother did not take that drug test, which was presumed positive. Mother missed a September 2025 drug test because she was "busy." To Father's knowledge, Mother was not using drugs, yet Thornton testified that of the ten drug tests that she requested Mother to take, she had not appeared for any. Thornton said that she had not received any drug-test results since the June 2025 test. Thornton explained at trial that Mother's failure to take the drug test was concerning because of Mother's history with drugs. According to Thornton, had Mother taken the test and tested negative for drugs, it would have shown the Department that she was able to abstain from drugs and care for her children such that the Department should continue working toward reunification. Thornton agreed that one-year-old Destiny needed a clean and sober parent to care for her.

Thornton described a domestic-violence event that Mother endured shortly before the trial. When Thornton spoke to Mother on October 24, 2025, she said that her window had been broken and that the tires on the vehicle driven by J.D. (the father of some of her children) had been sliced. Mother assumed that Father was responsible for the damage. Mother said that she was scared of Father because he had a pattern of abusing her and had threatened her. Mother told Thornton that she had made a police report and that the police had told her that Father was wanted for pending warrants.

11

When asked to summarize the effort that she had put forth to help Mother, Thornton stated,

> From the moment that I got the case, I wanted to make sure that I could assist and provide whatever services, support, [and] encouragement was needed for [Mother] to obtain reunification. I have had the opportunity to review the history of the case[,] and I have talked with [Mother] several times about the history and the change. I have also assisted with barriers of not being able to keep up with appointments, keep up with time, medical appointments, other necessary things by buying her a planner and a dry[-]eraser board to help alleviate some of those concerns when she expressed[, "]I'm busy, I'm tired, I forgot.["] So when she expressed concerns, I tried to do my best to help her with those concerns. And a major concern of mine when it comes to placing [Destiny] in the home is for safety and not only that, emotional support and being able to provide for her by taking her to her medical appointments that are needed.

When asked if Mother could provide a safe environment for Destiny, Thornton said, "Somewhat, but not all the way with concerns." She explained that although Mother had secured housing, she had not taken care of the Department's other concerns. Specifically, Mother needed to undergo a psychological evaluation to determine why she continued "to have these problems" and how they could be addressed. Additionally, the Department was concerned about whether Mother could get Destiny to her weekly appointments since Mother had a history of medical neglect and of not being compliant with visits.

When asked if Mother could meet Destiny's emotional and physical needs now and in the future, Thornton responded, "Not all the way." She explained that whenever she did a home check or observed a visit, she had to remind Mother to

12

cook breakfast and to change Destiny's diaper before she left; Thornton said that she was concerned what would happen if she were not there to coach Mother.

Thornton opined that Mother could not protect Destiny from emotional and physical danger now and in the future and said,

> [I]t goes back to being able to support and protect this child when she's in the home and not having things broken through the window. And also the concerns of being able to meet her psychological needs so that she can take care of her children emotionally, mentally[,] and physically.

As for Mother's parenting skills, Thornton said that Mother had tried to improve but had not been able to demonstrate that she could multitask, e.g., "trying to take care of an infant, trying to take care of a toddler, trying to go back and forth with teenagers to detention centers, get them to school." Thornton also reasserted the Department's concern about Mother's missing appointments and said that is "part of being a parent that needs to be taken care of."

Thornton opined that it would be in Destiny's best interest for the trial court to terminate Mother's parental rights. Thornton clarified that the Department was *not* asking the trial court to appoint Mother as Destiny's permanent managing conservator or to order a monitored return. Thornton explained that Mother had failed to change her behavior despite having the opportunity to do so and that she had failed to attend visits, which Thornton opined were "very important to bond with [one-year-old Destiny]" and to demonstrate to the Department that she prioritized Destiny.

When asked on cross-examination whether Mother's actions in being the sole caretaker for three of her children had demonstrated the ability to take care of her children, Thornton responded, "[T]here are still concerns with those three." Thornton later acknowledged that the Department was considering returning Mother's fourteen-year-old child to her. Thornton opined that Mother was providing a loving home for her teenagers and infant but did not believe that Mother was also able to provide a loving home for a toddler.

At the time of the termination trial, Father and Mother were still together, according to what Father had told Thornton, though he also said that Mother was unfit and did not deserve Destiny. Mother, however, had told Thornton that she and Father were not in a relationship.

Thornton said that on December 5, 2025—between the two trial dates— Destiny had been moved from the GRO to a foster home. Although the place where Destiny resided had changed, the foster parents were the same people who had cared for her at the GRO and wanted to adopt her.

### D. Mother's Testimony

Mother testified that she had ten children and that four were living with her at the time of the termination trial. Mother said that she was living with Maternal Grandmother when Destiny was removed from Father and that the Department had told her that Destiny could not be placed with her because her home was a one-bedroom apartment.

Mother admitted that she had twice participated in domestic-violence programs after being abused by the father of her other children and that she had still allowed him in her home during this case. She claimed that it was permissible because "he wasn't staying there and [because] he wasn't around all the time."

Mother claimed that she had become more self-sufficient and had "learned a lot of tools to work with when it comes to being a parent" through SafeHaven, parenting classes, individual and drug counseling, and therapy. Mother said that she had completed parenting classes and had received a certificate for Domestic Violence Psychoeducation Group, which taught her to recognize red flags and to set boundaries.

Mother had obtained housing assistance through SafeHaven, which paid her rent and her electricity bill and would provide a larger home for her after she finished another program. At the time of the trial, she had a two-bedroom apartment for her, Libby, Lizzy, Tiffany, and Jennifer. Mother said that Destiny could sleep in a pack-and-play crib in Mother's bedroom.

When asked about sources of income, Mother said that she was "fixing to start a work[-]from[-]home job" and that she was going to start school in January 2026 to get her high school diploma and a Level One Certification, possibly in welding. Mother was receiving SNAP benefits at the time of the trial and believed that she would be able to care for Destiny's basic needs.

According to Mother, the five visits that she had with Destiny in her home were "good." Mother said that Destiny "play[ed], laugh[ed], talk[ed], . . . and like[d] to eat a lot" so they spent most of the time playing and eating. Mother noted that Destiny had a good relationship with her siblings and that she (Mother) was in a position to help Destiny maintain the bond with her siblings.

Mother said that her parents served as her support system and provided as much support as she needed. They dropped off food and diapers and checked on her and the children regularly. Mother said that Maternal Grandmother is able to babysit when Mother needed help.

Mother disagreed with Thornton's testimony about drug testing. Mother said that she had taken two or three tests since giving birth to Libby in February 2025. The trial court admitted into evidence Mother's exhibit of the results from a June 11, 2025 drug test showing that she was positive for hydrocodone until further verification of a prescription and also admitted into evidence a prescription for hydrocodone. Mother said that she had originally been prescribed hydrocodone after her C-section and was still taking it due to pain in her leg from having a rod and screws in her knee, though she admitted that the prescription was not written for her leg pain.[12]

---

[12]Mother said that the pain did not prevent her from caring for her children.

Mother mentioned that she had taken a drug test two or three months prior to the trial (i.e., October or September 2025) on Main Street in Arlington and that it was clean except for her hydrocodone prescription.

Mother admitted that she had abused prescription hydrocodone in the past after her leg surgery and that was one of the main reasons that five of her children were removed from her care in March 2023. She said that her classes "and all the information [that she had] been getting" had taught her not to abuse hydrocodone. Mother had not been prescribed cocaine or THC and did not know how she had tested positive for those substances in March 2025.

As for Mother's relationship with Father, she said that she was not in a romantic relationship with him. When questioned about her having been seen holding his hand while walking down the street at lunch during the trial, she said that she was only "holding his arm . . . because it was cold." She stated that she had set boundaries, telling Father that he could not come to her home and could not call "all times of the night to speak with the baby." Mother believed that she could be protective of Destiny and that she and Father could coparent on their own without the Department's involvement because she had learned coparenting skills in her classes.

Mother sought to have the trial court order a monitored return of Destiny. Alternatively, Mother sought to have the trial court grant her counterpetition seeking to be named sole managing conservator of Destiny. Mother said that would be in

Destiny's best interest because "she will be tooken [sic] care of -- like her mom can take care of her. She won't be as sick.[13] She will grow up knowing who she is, who her siblings is [sic], who her family is[,] and I feel like that I can love her more than anybody."

### E. The Ad Litem's Oral Report

The ad litem provided the trial court with an oral report, stating that

[a]t this time, [Destiny's] doing great in her current placement and that is the same family that's been taking care of her.

. . . .

. . . The concerns I have especially after the testimony this week and the previous hearing, Judge, I've got some concern that . . . [M]other continues to use the [h]ydrocodone even though it was prescribed back in February. And since that is the drug that she had the issue with to begin with, in good consci[ence], at this time, I do not have a clean test on . . . [M]other at all that shows that she's not using opioids. And at this time, I can't recommend placing a child in that current situation, Judge. So I would ask that her rights be terminated[,] and if the [c]ourt doesn't believe that termination is appropriate in this case, then [permanent managing conservatorship] to the Department at this point.

### F. Crucial Drug Test

After hearing closing arguments, the trial court asked Mother when she had last used an illegal drug (excluding hydrocodone for which she had a prescription), and Mother replied, "I haven't." The trial court ordered Mother to take a hair test and a

---

[13]Mother explained that since being in the Department's care, Destiny was "always sick"—ringworms, a snotty nose, a busted lip, a scrape on her face, or hand-foot-mouth disease. Mother opined that five or six visits had been canceled due to Destiny's being sick.

urinalysis before the lab closed that day and stated that if those tests were clean, then the court would grant Mother's request for a monitored return; otherwise, the trial court would move forward with terminating her parental rights to Destiny. Mother, however, failed to comply with the trial court's December 10, 2025 verbal orders.

## G. Outcome

The trial court thereafter terminated Mother's parental rights to Destiny based on the endangerment grounds, the prior termination ground, and the best-interest ground. The trial court terminated Father's parental rights to Destiny based on the endangerment grounds and the best-interest ground. Father and Mother then perfected appeals from the trial court's termination order.

## III. Father's Appeal

Father's court-appointed appellate attorney filed a brief averring that after diligently reviewing the record, she believes that the appeal is frivolous. *See Anders*, 386 U.S. at 744–45, 87 S. Ct. at 1400; *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (reasoning that *Anders* procedures apply in noncriminal appeals when appointment of counsel is mandated by statute). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Father did not file a response. The Department, in its brief responding to Mother's brief, stated in a footnote that it agreed with Father's appellate counsel that he has no meritorious grounds upon which

19

to advance an appeal and that because he has not pointed to any arguable grounds for relief, "the Department will not reply to the *Anders* brief."

As the reviewing appellate court, we must independently examine the record to decide whether an attorney is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.). Having carefully reviewed the record and the *Anders* brief, we agree that Father's appeal is frivolous. We find nothing in the record that might arguably support his appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).

Father's counsel also filed a motion to withdraw, but the record does not show good cause for withdrawal independent from her conclusion that the appeal is frivolous. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (order); *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied). Accordingly, we deny counsel's motion to withdraw; counsel remains appointed through proceedings in the Texas Supreme Court unless otherwise relieved of those duties. *See P.M.*, 520 S.W.3d at 27–28; *In re L.B.*, No. 02-25-00083-CV, 2025 WL 1909329, at *2 (Tex. App.—Fort Worth July 10, 2025, no pet.) (mem. op.); *see also* Tex. Fam. Code Ann. § 107.016(2)(C).

## IV. Mother's Appeal

In her first three points, Mother challenges the three predicate grounds that the trial court found, and in her fourth point, she challenges the best-interest finding.

After analyzing her arguments, we conclude that they fail, and we uphold the termination order.

## A. Endangerment Predicate Grounds

In her first and second points, Mother challenges the sufficiency of the evidence to support the trial court's endangering-environment and endangering-conduct predicate grounds. Mother argues that because the Department did not call the investigator or ask the trial court to take judicial notice of the clerk's record, because there was no evidence concerning drug testing at Destiny's birth or the care Mother provided for Destiny during her first few months of life, because Destiny was removed from Father's care (not Mother's) due to concerns about his drug use, and because there is no evidence that Mother voluntarily gave Father possession of Destiny, the evidence is insufficient to show that Mother endangered Destiny. Mother, however, overlooks her failure to comply with the trial court's December 10, 2025 order to submit to a drug test, in which the trial court warned that its decision would be determined based on the drug test. Thus, we conclude that her challenges to the endangerment grounds fail.

### 1. Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re*

21

*Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child

relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 2. Applicable Law

This court has previously set forth the law on endangerment findings and demonstrated how a parent's conduct may be considered within an endangering-environment analysis under Subsection (D):

> Subsections (D) and (E) both require a finding of endangerment. "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. [*Boyd*], 727 S.W.2d at 533.
>
> Endangerment under Subsection (D) arises from the child's environment, but a parent's conduct can contribute to an endangering environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "[A]busive or violent conduct by a parent or other

23

> resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.*; *see J.V.*, 2015 WL 4148500, at *3 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under [S]ection 161.001(b)(1)(D).")... Subsection (D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

*In re B.U.*, No. 02-23-00150-CV, 2023 WL 5967604, at *3 (Tex. App.—Fort Worth Sept. 14, 2023, pet. denied) (mem. op.).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, endangerment under Subsection (E) "is not limited to actions directed towards the child," *J.F.-G.*, 627 S.W.3d at 315 n.43 (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Nor is it necessary to establish that the parent's conduct caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *In re R.R.A.*, 687 S.W.3d 269, 277–78 (Tex. 2024).

As we have noted in a prior opinion,

> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

For instance, because a parent's illegal drug use exposes her child to the possibility the parent may be impaired or imprisoned, evidence of illegal drug use supports a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *See J.O.A.*, 283 S.W.3d at 345. And "[a] parent's drug use . . . may make the child's environment endangering to the child." *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.). Moreover, "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346.

### 3. Analysis

In her brief, Mother relies heavily on the following facts: (1) the Department did not remove Libby from Mother's care after Mother gave birth to her while this case was pending, (2) the Department felt it was safe to return to Mother one of her

teenage daughters who was in the Department's permanent managing care, (3) Mother properly sought SafeHaven's services and obtained housing, (4) she completed domestic-violence classes and took steps to protect her children, and (5) she had a prescription for the hydrocodone that she tested positive for on a June 2025 drug test. Mother, however, ignores the crucial fact in this case: Mother failed to comply when the trial court ordered her to take a drug test on December 10, 2025, and made clear that its decision—to grant her a monitored return or to terminate her parental rights to Destiny—rested on the results of that test. Mother had tested positive for various illegal drugs in March 2025, and Thornton testified that Mother had failed to submit to numerous requested drug tests. It was clear that the trial court wanted assurance that Mother was not using drugs before it would grant her request for a monitored return of Destiny. But Mother failed to provide that assurance.

Moreover, although not expressly relied on by the trial court, the evidence demonstrated Mother's willingness to allow Father to take Destiny despite his status as a drug dealer and drug user (or if he took her without Mother's permission, there is no evidence that she reported Destiny's disappearance to the police), her justification in allowing her prior abusive partner access to her home while her infant child was there, and her decisions to leave her infant in her teenagers' care despite past incidents involving physical abuse in her absence.

Applying the standards of review set forth above, we hold that the evidence is legally and factually sufficient to support the trial court's endangerment findings. *See*

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *J.O.A.*, 283 S.W.3d at 345; *J.S.*, 675 S.W.3d at 128.  We overrule Mother's first and second points.

**B.   Predicate Ground Based on Prior Termination on an Endangerment Ground**[14]

In her third point, Mother argues that the trial court's December 16, 2025 letter ruling should control over the January 5, 2026 termination order.  Specifically, Mother contends that the written "rendition contained all the other requisites for a final order."  Mother cites the correct law but fails to correctly apply it to the letter ruling at issue.

**1.   Applicable Law**

"Courts have generally not accorded final-judgment status to letter rulings." *Perez v. Perez*, 658 S.W.3d 864, 871 (Tex. App.—El Paso 2022, no pet.).  As explained by the Texas Supreme Court and as quoted in Mother's brief,

> Reducing a decision to final judgment has three phases:  (1) rendition; (2) signing; and (3) entry.  Rendition and signing are judicial acts that can, but need not, occur at the same time.  Entry, on the other hand, is a clerical act undertaken by the clerk of the court.  A judgment's "rendition" is "the judicial act by which the court settles and declares the decision of the law upon the matters at issue."  Rendition of judgment requires a present act, either by spoken word or signed memorandum, that decides the issues on which the ruling is made.  If the judge's words

---

[14]Even though only one predicate ground, plus best interest, is required for termination, we will analyze Mother's challenge to the prior-termination-on-endangerment ground to determine whether the termination order should be modified to delete that ground.  *See generally* Tex. Fam. Code Ann. § 161.001(b); *Z.N.*, 602 S.W.3d at 545 (both providing that termination requires clear and convincing evidence (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1), and (2) that termination is in the child's best interest).

only indicate an intention to render judgment in the future or to provide guidelines for drafting a judgment, the pronouncement cannot be considered a present rendition of judgment.

Words reflecting the judge's present declaration of a decision are necessary, but not sufficient, to effect the rendition of a judgment. "Generally, a judgment is rendered when the decision is officially announced orally in open court, by memorandum filed with the clerk, or otherwise announced publicly." For writings, courts have held that a letter to counsel could constitute a pronouncement of judgment if the letter (1) uses language reflecting a present intent to render judgment, (2) provides sufficient detail to state the court's decision on the matters at issue, and (3) is filed with the clerk of court. Other cases seemingly hold, or at least suggest, that letter rulings may suffice even if they are shared only with the parties or their counsel.

*Baker v. Bizzle*, 687 S.W.3d 285, 291–92 (Tex. 2024) (footnotes omitted).

### 2. What the Record Shows

As noted above, at the conclusion of the termination trial, the trial court orally ordered Mother to take a drug test and said that termination would be decided based on the results of that test:

THE COURT: . . . I'm going to order that a drug test is scheduled and taken today. I want that to be a hair and a urinalysis test. Contingent upon the results of that test, if those tests are clean, then the [c]ourt will grant . . . Mother's Request for a Monitored Return.

If those results are not clean, then I believe the [c]ourt will be forced to move forward with a termination in this matter based on the (D) and (E) grounds. However, those two will be contingent upon the results of that drug test. If the information received is correct, then we should be proceeding with a [m]onitored [r]eturn. If there is a -- some falsities in that -- those statements, then we will be proceeding with the termination. The Department will be appointed the [m]anaging [c]onservator of the child in that case on the (D) and (E) grounds. The [c]ourt will find that would be in the best interest of the child. The [c]ourt would further find that if that is the case that the Department has

28

made reasonable efforts to return the child and were unable to do so after such reasonable efforts. However[,] the [c]ourt's hope is that we're not going there and that we're moving forward to a [m]onitored [r]eturn after a successful return of those results. Once those results have been received, if they are negative, within three business days, the [c]ourt will order the [m]onitored [r]eturn to be effective and the child returned to [M]other.

. . . .

[THE DEPARTMENT]: All right. And then, Your Honor, if . . . the result[s] are positive for an illegal drug and the [c]ourt terminates in that [p]roposed [o]rder[,] I also had constructive abandonment for each parent along with the (M) as in Martha ground for the Respondent Mother based on her prior (D) and (E). Does the [c]ourt make any findings on those termination grounds?

THE COURT: As to constructive abandonment, the [c]ourt will deny that ground. As to prior termination because we have had a prior termination, we would be granting that ground as well.

Mother did not comply with the trial court's oral order as reflected in the trial

court's December 16, 2025 letter ruling:

The [c]ourt issues the following rendition in furtherance of its in-court rendition:

1. [Mother] has failed to comply with the verbal orders of the [c]ourt as stated on December 10, 2025; therefore, the [c]ourt's order[s] concerning termination of her parental rights are adopted by this rendition *and shall be presented in the final orders in this matter.*

2. The [c]ourt further finds that the Department . . . and [OCOK], as its agent, has made reasonable efforts to return the child to [Father] or his designated representatives[] but has been unable, despite its efforts, to return the child to [Father].

3. The [c]ourt also finds that termination on the D & E grounds of Texas Family Code [S]ection 161.001(b)(1) is in the best interest of

the child. Therefore, [Father's] parental rights to the subject child are terminated on those grounds.

4. The [c]ourt appoints the Department . . . as the [c]onservator of said child and may make all necessary decisions on behalf of the child until further orders are granted in this matter.

5. The [c]ourt continues the attorney[–]client relationship between [the ad litem] and the child until further orders of the court. The court[-]appointed attorney[–]client relationships between [Mother and Father] and their counsel[] are terminated 30 days *after the signing of the final order in this matter.* [Emphases added.]

On January 5, 2026, the trial court signed a final order terminating Mother's parental rights based on predicate grounds (D), (E), and (M) and the best-interest ground.

### 3. Analysis

We note at the outset of our analysis that Mother does not challenge the sufficiency of the evidence to support the (M) finding. Instead, she urges that the letter ruling "eliminating an (M) finding controls over the subsequent [o]rder of [t]ermination." Mother's argument falls flat because despite having cited *Baker*, she fails to apply its tenets to the letter ruling.

A plain reading of the letter ruling reflects (1) an intention to render judgment in the future, and (2) the absence of any details specifying the Section 161.001(b) termination grounds that the trial court found as to Mother. The letter ruling references "the [c]ourt's order concerning termination of her parental rights" but fails to state what those grounds are. Anyone attempting to enforce the letter ruling as a

final judgment would have to go back to the reporter's record to find out "the [c]ourt's order concerning termination of her parental rights." Moreover, because the letter ruling is silent as to the specific termination grounds that it found as to Mother, the letter ruling does not conflict with either the trial court's oral pronouncement or the final termination order. The letter ruling, instead, provides an update—that Mother did not follow through on the trial court's order to undergo a drug test and that it would be proceeding under termination rather than a monitored return. The words in the letter ruling indicate only an intention to render judgment in the future and to provide guidelines for drafting a final judgment, and thus the pronouncement cannot be considered a present rendition of judgment.[15] *See id.* at 292.

We overrule Mother's third point.

## C. Best-Interest Ground

In her fourth point, Mother argues that the evidence is factually insufficient to support the trial court's best-interest finding. Mother included an analysis of the *Holley* factors in her brief, but we differ with her conclusion and hold that most of the factors weigh in favor of termination.

### 1. Burden of Proof and Standard of Review

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest

---

[15]For all of these reasons, we disagree with the Department's footnote stating that "the trial court's letter is a rendition of the judgment."

analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider,

32

among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 2. Analysis

#### a. Destiny's Desires

Regarding Destiny's desires, she was only one year old and did not testify at trial. Mother emphasizes that "[h]er 15-year-old [daughter] who was in [the Department's] care under the prior suit[] was placed with . . . [M]other during the pendency of this suit," that the Department was considering returning another of Mother's teenage daughters to her, and that her teenager daughters who were old enough to express their desires chose to live with her. As noted by the Department, Mother's "reliance on the older, independent children wanting to return to [her] is misplaced because (1) they are able to care for themselves, unlike a small child[,] and (2) they are not subject to this suit." Mother's brief does not describe any bond with Destiny, and Thornton noted that any bond that had developed was not consistent because Mother had attended only one-third of the visits offered from April 2025 when Thornton took over the case until the trial in December 2025. Moreover, the record demonstrated that Destiny was well cared for by her foster parents and was

33

bonded to them as they had cared for her since her removal from Paternal Grandmother's home. *See In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well[ ]cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best[-]interest determination and, specifically, is relevant to the child's desires."). This factor weighs in favor of termination.

> **b.** **Destiny's Emotional and Physical Needs and the Emotional and Physical Dangers to Her Now and in the Future, as Well as the Parental Abilities of Those Seeking Custody**

As to Mother's ability to meet Destiny's emotional and physical needs and the emotional and physical dangers to her now and in the future, Thornton expressed concerns about Mother's ability to care for her children's emotional and physical needs and opined that Mother could not protect Destiny from emotional danger now and in the future, pointing to the incident when Father broke Mother's window. Mother contends that "[t]he Department made the decision in August 2025 that [she] could meet the emotional and physical needs of her newborn," that "[a]ny remaining fears about . . . [M]other's ability to meet the emotional and physical needs of her children should have been dispelled by the Department's return of her 15-year-old to her possession," that she could maintain Destiny's bond with her siblings, that her enrollment in SafeHaven was designed to protect her children from the emotional and

physical danger that Father presented, and that there was "no evidence in [her] past that indicated [that] she lacked parental abilities" as Destiny was removed from Father's care for his drug use. Mother's arguments ignore the negative evidence against her:

- Mother had no knowledge of Destiny's whereabouts at the time she was removed from Father (an admitted drug user and drug dealer) or during the two months prior and had not reported her missing;

- She had trouble multitasking when a toddler was added to the mix, and Thornton had to coach Mother through her visits on what to do, including feeding and changing Destiny;

- The Department visited the home weekly because they were concerned about the safety of the children being around Jennifer;

- Mother had a history of not taking her children to medical appointments, and because Destiny was often sick, she would likely need to be taken to the doctor;

- Mother attended only twenty-three of the fifty-four visits that the permanency specialists offered her and was often unable to be located when Rountree had the case;

- Mother left her teenagers to care for Libby despite that prior abuse had occurred when she had previously left her teenagers to care for her younger children;

- Mother claimed that she had learned to recognize red flags yet she allowed her other children's father to visit the home even though he had a history of perpetrating domestic violence on her, and she was seen walking with Father at lunch during the trial despite his prior abuse of her; and

- Mother tested positive for cocaine and marijuana in March 2025 and failed to take ten requested drug tests that Thornton requested as well as

35

the one that the trial court ordered at the conclusion of the termination trial.

Destiny's foster parents were "very hands on," kept the Department informed, made sure that she was ready for visits and ECI appointments, and made sure that she was properly clothed and fed.

These three factors weigh in favor of termination.

### c. Programs Available to Promote Destiny's Best Interest

With regard to the programs available to assist Mother to promote Destiny's best interest, the record demonstrates that Mother took advantage of many of the services offered to her but that she had failed to change her behavior and had failed to demonstrate the ability to multitask when caring for an infant, a toddler, and teenagers. The trial court was entitled to conclude that this factor weighed slightly in favor of termination.

### d. Plans for Destiny

Mother's plans were for Destiny to live with her and her other children that were living with her in a larger home that she would obtain through SafeHaven. As to the Department's plans for Destiny, Thornton testified that the plan was termination of Mother's parental rights and that Destiny's foster parents were adoption motivated. This factor was neutral.

### e. Stability of the Home and Proposed Placement

With regard to the stability of Mother's home, the record reflects that the case's dismissal deadline was extended in June 2025 for Mother to obtain housing assistance through SafeHaven and that she did so. Thus, at the time of the termination trial, she had approximately six months of housing stability.[16] The Department placed Destiny with the adoption-motivated foster parents between the two trial dates; although the home physically changed, the foster parents had provided care for her throughout the case. This factor is neutral or weighs slightly in favor of termination. *See In re S.A.W.*, 131 S.W.3d 704, 709 (Tex. App.—Dallas 2004, no pet.) (holding termination to be in child's best interest despite mother's lifestyle improvements and eventual compliance with service plan); *In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that a parent's "recent turnaround" and compliance with a service plan are factors that should be considered when determining best interest but are not solely determinative).

### f. Acts and Omissions, as Well as Excuses

Regarding Mother's acts or omissions indicating that the existing parent–child relationship is not a proper one, we have thoroughly detailed those above under various other factors. As for any excuses for Mother's acts or omissions, she missed visits due to not having a working cell phone or not having it charged to request an

---

[16]As noted by the Department, Mother's "home is arguably the most stable it has been in years, but concerns remain due to her drug use, history of domestic violence, and lack of proper parenting."

Uber, she skipped a drug test because she was "busy," she justified having the father of her other children in her home even though he had committed domestic violence against her because "he wasn't staying there and . . . wasn't around all the time," and she defended her continued use of hydrocodone (which was prescribed in February 2025 following her C-section) as necessary for her leg pain. These factors weigh in favor of termination.

### g.      Factors Weigh in Favor of Termination

Based on all the evidence and applying the appropriate standards of review, we hold that the evidence is factually sufficient to support the trial court's finding that termination of Mother's parental rights to Destiny is in her best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *see also In re A.V.*, No. 11-23-00144-CV, 2023 WL 8631492, at *8 (Tex. App.—Eastland Dec. 14, 2023, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support the best-interest finding based on, among other things, mother's lack of parental abilities, history of domestic violence and drug abuse, her inability to provide a safe and stable environment, and the lack of justification for her misconduct). Accordingly, we overrule Mother's fourth point.

## V. Conclusion

Having held that nothing in the record might arguably support Father's appeal and having overruled Mother's four points, we affirm the trial court's judgment terminating Father's and Mother's parental rights to Destiny.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  April 30, 2026